**BRADLEY/GROMBACHER, LLP**
Marcus Bradley, Esq. (SBN 174156)
Kiley Grombacher, Esq. (SBN 245960)
Lirit King, Esq. (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, CA 91361
Telephone: (805) 270-7100
Facsimile: (805) 618-2939
Email:
mbradley@bradleygrombacher.com
kgrombacher@bradleygrombacher.com
Email: lking@bradleygrombacher.com

**CAPSTONE LAW APC**
Orlando Villalba, Esq. (SBN 232165)
Helga Hakimi, Esq. (SBN 257381)
Roxanna Tabatabaeepour, Esq.
(SBN260187)
1875 Century Park East, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 556 4811
Facsimile: (310) 943 0396
Email:
Orlando.Villalba@capstonelawyers.com
Helga.Hakimi@capstonelawyers.com
Roxanna.Taba@capstonelawyers.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRO RODRIGUEZ<br><br>PLAINTIFF,<br><br>v.<br><br>MITSUBISHI CHEMICAL CARBON FIBER AND COMPOSITES, INC., et al.<br><br>DEFENDANT | **CASE NO. 8:21-CV-01711-CJC (JDEx)**<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: June 12, 2023<br>Time: 1:30 p.m.<br>Place: Courtroom 9B |

## NOTICE OF MOTION FOR FINAL APPROVAL

**TO THE CLERK OF COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD, PLEASE TAKE NOTICE THAT:**

On June 12, 2023, at 1:30 p.m. or as soon thereafter as can be heard in Courtroom 9B of the above-captioned Court, located at the Ronald Reagan Federal Building and United States Courthouse, 411 West Fourth Street, Santa Ana, CA 92701, plaintiff Sandro Rodriguez ("Plaintiff") will and hereby does move the Court for an Order granting final approval of the parties' class settlement, certifying a class for settlement purposes, approving class counsel's fees and expenses, approving Plaintiff's service payment, and granting such other and further relief as the Court deems just and proper. This motion is not opposed by defendants Mitsubishi Chemical Carbon Fiber and Composites, Inc., Mitsubishi Chemical Holdings America, Inc. and Mitsubishi Chemical America, Inc. ("Mitsubishi" or "Defendants".)

This motion shall be based on the memorandum of points and authorities filed by Plaintiff, the Declarations of Plaintiff, Jarrod Salinas, Kiley Lynn Grombacher, and Raul Perez, and the exhibits thereto, and the Court's own records, files, notes, and other documents on file in this matter, as well as upon all oral and/or documentary evidence as may be properly presented at the time of the hearing of this matter.

DATED: May 4, 2023

**BRADLEY/GROMBACHER, LLP**
**CAPSTONE LAW APC**

By:  */s/ Kiley Grombacher*
Marcus Bradley, Esq.
Kiley Grombacher, Esq.
Lirit King, Esq.
Orlando Villalba, Esq.

Attorneys for Plaintiff

**II**

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................... 1

II.  STATEMENT OF RELEVANT FACTS ........................................ 1

     A.   Procedural History .............................................................. 1

     B.   Mediation & Negotiation .................................................... 2

     C.   Preliminary Approval .......................................................... 2

III. OVERVIEW OF SETTLEMENT TERMS ................................... 2

     A.   The Proposed Settlement Class .......................................... 2

     B.   Settlement Terms ................................................................. 3

          1.   Class Representative's General Release Payment ...... 3

          2.   Attorneys' Fees and Costs ......................................... 3

          3.   Payment to the LWDA and PAGA Releasees ............. 4

          4.   Settlement Administration Expenses .......................... 4

          5.   Settlement Payments to Class Members .................... 5

          6.   Funding and Distribution of Settlement Funds ......... 6

          7.   Uncashed Checks ...................................................... 7

IV.  RELEASED CLAIMS ..................................................................... 7

V.   THE SETTLEMENT ADMINISTRATOR HAS DUTIFULLY
     COMPLIED WITH THE NOTICE PROVISIONS AND THE
     COURT'S PRELIMINARY APPROVAL ORDER ................................ 8

     A.   Notice Procedures ............................................................... 8

     B.   Class Members' Responded Overwhelmingly Favorably to
          the Settlement ..................................................................... 9

          1. There were No Objections, Exclusions or Disputes By
             Class Members ........................................................... 9

VI.  ANALYSIS ....................................................................................... 9

     A.   Class Certification Is Appropriate ...................................... 9

     B.   The Court Should Grant Final Approval Under
          Fed.R.Civ.P. 23 ................................................................ 10

          1.   Legal Standard ......................................................... 10

2.   The *Churchill* Factors Support Approval of the
     Settlement ....................................................................11

     a.   The Strength of Plaintiff's Case ....................................11

     b.   The Risk, Expense, Complexity and Likely
          Duration of Further Litigation & the Risk of
          Maintaining Class Action Status through Trial..............14

     c.   The Amount Offered In Settlement...............................15

     d.   The Extent of the Discovery and the Stage of
          the Proceedings..............................................................17

     e.   The Experience and Views of Counsel .........................17

     g.   The Reaction of the Class Has Been
          Overwhelmingly Positive Which Weighs in
          Favor of Approval ..........................................................18

     h.   The Attorney's Fees Sought Are Reasonable ................19

     i.   The Incentive Award Is Reasonable...............................19

C.   The PAGA Settlement Should be Approved ......................................19

VII.  CONCLUSION ..............................................................................................22

v

**TABLE OF CONTENTS**

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Ali v. USA. Cab Ltd.*
    176 Cal. App. 4th 1333 (2009).........................................................13

*Aqui v. Sutton Foundation, Inc.*
    Case No. 30-2008-00180062 (Orange County Super. Ct.)............................12

*Arias v. Superior Court*
    46 Cal. 4th 969 (2014).................................................................19

*Badami v. Grassroots Campaigns, Inc.*
    Case No. C 07-03465 JSW (N.D. Cal. Sept. 15, 2008).................................12

*Bellinghausen v. Tractor Supply Co.*
    306 F.R.D. 245 (N.D. Cal. 2015)......................................................15

*Blackwell v. Skywest Airlines, Inc.*
    245 F.R.D. 453 (S.D. Cal. 2007).......................................................13

*Brinker v. The Superior Court of San Diego*
    53 Cal. 4th (2012)....................................................................12

*Brooks v. Life Care Centers of Am., Inc.*
    No. SACV1200659CJCRNBX, 2015 WL 13298569 (C.D. Cal.
    Oct. 19, 2015)........................................................................11

*Brown v. Fed Express Corp.*
    249 F.R.D. 580 (C.D. Cal. 2008)......................................................13

Campbell v. Best Buy Stores, L.P.
    2013 U.S. Dist. LEXIS 137792 (C.D. Cal. Sept. 20,2013)............................13

*Contreras v. United Food Group, LLC*
    Case No. BC389253 (L.A. County Super. Ct.).........................................12

*Contreras v. Worldwide Flight Servs., Inc.*
    No. CV 18-6036 PSG (SSX), 2020 WL 2083017
    (C.D. Cal. Apr. 1, 2020)..............................................................21

*Cotter v. Lyft, Inc.*
    193 F. Supp. 3d 1030 (N.D. Cal. 2016)................................................20

*Doty v. Costco Wholesale Corp.*
    Case No. CV05-3241 FMC-JWJx (C.D. Cal. May 14,2007).............................12

*Ferra v. Loews Hollywood Hotel, LLC*
    11 Cal. 5th 858 (2021)................................................................14

*Fukuchi v. Pizza Hut*
 Case No. BC302589 (L.A. County Super. Ct.) ............................................... 12

*Gomez v. Amadeus Salon, Inc.*
 Case No. BC392297 (L.A. Super. Ct.) ......................................................... 12

*Gonzalez v. Officemax N. Am.*
 2012 U.S. Dist. LEXIS 163853 (C.D. Ca. Nov. 5,2012) ............................... 13

*Hanlon v. Chrysler Corp.*
 150 F.3d 1011 (9th Cir. 1998) ....................................................................... 20

*Hopson v. Hanesbrands, Inc.*
 No. CV 08-0844 EDL, 2008 WL 3385452
 (S.D. Cal. Apr. 13, 2009) ............................................................................. 21

*In re M.L. Stern Overtime Litig.*
 No. CV 07-0118 BTM (JMAx), 2009 WL 995864
 (S.D. Cal. Apr. 13, 2009) ............................................................................. 21

*Jimenez v. Allstate Ins. Co.*
 2012 U.S. Dist. LEXIS 65328 (C.D. Cal. Apr. 18 2012).............................. 13

Kenny v. Supercuts, Inc.
 252 F.R.D. 641 (N.D. Cal. 2008) ................................................................. 13

*Kim v. Allison*
 8 F.4th 1170 (9th Cir. 2021).......................................................................... 11

*Kullar v. Foot Locker Retail, Inc.*
 168 Cal. App. 4th 116 (2008) ........................................................................ 14

*Lewis v. Wells Fargo Co.*
 669 F. Supp. 2d 1124 (N.D. Cal. 2009) ........................................................ 10

*Lim v. Victoria's Secret Stores, Inc.*
 Case No. 04CC00213 (Orange County Super. Ct.) ...................................... 12

*Linney v. Cellular Alaska P'ship*
 151 F.3d 1234 (9th Cir. 1998)................................................................. 11, 15

*Litty v. Merrill Lynch & Co.*
 No. cv 14-0425 PA (PJWX), 2015 WL 4698475
 (C.D. Cal. Apr. 27, 2015) ............................................................................. 10

*McClure v. Waveland Services, Inc.*
 No. 2:18-cv-01726-KJM-AC, 2021 WL 5204151
 (E.D. Cal Nov. 09, 2021)............................................................................... 20

*Nat'l Coal. of Ass'ns of 7-Eleven Franchisees v. Southland Corp.*
 210 F.3d 384 (9th Cir. 2000).......................................................................... 19

**VI**
**TABLE OF AUTHORITIES**

*Ochinero v. Ladera Lending, Inc.*
No. SACV191136JVSADSX, 2021 WL 4460334
(C.D. Cal. July 19, 2021)............................................................ 14, 15

*O'Connor v. Uber Technologies, Inc.*
201 F. Supp. 3d (N.D. Cal. 2016) ........................................... 20, 22

*O'Connor v. Uber Techs., Inc.*
No. 13-cv-03826-EMC, 2019 WL 4394401
(N.D. Cal. Sept. 13, 2019)................................................................ 10

*Ordonez v. Radio Shack, Inc.*
2013 U.S. Dist. LEXIS 7868 (C.D. Cal. Jan. 17,2013)................................ 13

*Pena v. Taylor Farms Pac., Inc.*
No. 13-1282, 2021 WL 916257 (E.D. Cal. Mar. 10, 2021) ............................ 20

*Ramirez v. Benito Valley Farms, LLC*
No. 16-4708, 2017 WL 3670794 (N.D. Cal. Aug. 25, 2017) ......................... 20

*Ressler v. Federated Department Stores, Inc.*
Case No. BC335018 (L.A. County Super. Ct.) ............................................... 12

*Sakkab v. Luxottica Retail N. Am. Inc.*
803 F.3d 425 (9th Cir. 2015)..................................................................... 19

*Sandoval v. Nissho of Cal., Inc.*
Case No. 37-2009-00091861 (San Diego County Super. Ct.) ...................... 12

*Sorenson v. PetSmart, Inc.*
Case No. 2:06-CV-02674-JAM-DAD (E.D. Cal.) ........................................ 12

*Wershba v. Apple Computer, Inc.*
91 Cal. App. 4th 224 (2001).................................................................... 15

*Wise v. Ulta Salon, Cosmetics & Fragrance, Inc.*
No. 17-853, 2020 WL 1492672 (E.D. Cal. Mar. 27, 2020) ........................... 21

Rules

Fed. R. Civ. P. 23(a)(1)-(4)............................................................................9

Fed. R. Civ. P. 23(b)(3) ........................................................................ 9, 10

Fed. R. Civ. P. 23(e) .......................................................................... 11, 14

Fed. R. Civ. P. 23(e)(2)............................................................................ 11

Codes

Lab. Code § 2699(e)(2)......................................................................... 20

**TABLE OF AUTHORITIES**

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

On January 18, 2023, this Court preliminarily approved the Joint Stipulation of Class Action Settlement and Release (Doc. No. 26) entered into by Plaintiff Sandro Rodriguez ("Plaintiff") and defendants Mitsubishi Chemical Carbon Fiber and Composites, Inc., Mitsubishi Chemical Holdings America, Inc. and Mitsubishi Chemical America, Inc. ("Mitsubishi" or "Defendants"). Subsequently, the Court-appointed settlement administrator Phoenix Settlement Administrators ("Phoenix") distributed the approved class notice to the Settlement Class members in compliance with the Court's preliminary approval order.

The parties are pleased to report that **<u>every single member of the settlement class elected to participate in the settlement and not a single class member filed any objection to the Settlement</u>**. Declaration of Jarrod Salinas ("Salinas") at ¶ 7, 8. Given the unanimous support of the Settlement, Plaintiffs now move the Court for final approval pursuant to Rule 23(e).

**II.    STATEMENT OF RELEVANT FACTS**

**A.    Procedural History**

Plaintiff filed a class action complaint on September 7, 2021, alleging multiple wage and hour class action claims against Defendants, including claims for unpaid wages due to alleged off-the-clock work, failure to provide meal and rest breaks, unreimbursed business expenses, failure to pay vacation wages, failure to provide safety devices, and the standard derivative wage and hour claims. On October 14, 2021, Defendants removed the class action to this Court.

On April 4, 20200, Plaintiff filed a separate lawsuit in the Orange County Superior Court seeking civil penalties under the Private Attorneys General Act of 2004, California Labor Code sections 2698, et seq. ("PAGA") premised on the same violations as those alleged in his class action complaint, entitled *Rodriguez v. Mitsubishi Chemical Carbon Fiber and Composites, Inc. et al.*, Case 30-2022-

1    01253057-CU-OE-CXC ("PAGA Action".) The PAGA Action was dismissed on

2    September 30, 2022.

3         **B.    Mediation & Negotiation**

4         For purposes of mediation, Mitsubishi shared time and payroll records for a

5    randomly selected sample population of 20% of the putative class during the Class

6    Period. Mitsubishi also provided policy documents and other information in the

7    interest of resolving these matters, including excerpts from its handbooks. The

8    parties agreed to stay formal discovery while the parties proceed with mediation.

9         Additionally, prior to mediation, Mitsubishi informed Plaintiff's counsel of an

10   earlier class action settlement in the *Henry Cress* class action (Case No. 34-2017-

11   00222101, Sacramento County Superior Court), which released similar claims to

12   those alleged here through December 22, 2018. Plaintiff reviewed the relevant

13   documents and the parties agreed to resolve all class and PAGA claims for the

14   shorter time period not covered by the *Cress* lawsuit

15        Armed with this information, and through mediation conducted on May 26,

16   2022, with Judge Gandhi, Plaintiff was able to reach an agreement in principle on a

17   settlement.

18        **C.    Preliminary Approval**

19        On January 18, 2023, this Court granted preliminary approval of the parties'

20   settlement in substantial part. (Order at Dkt 26.) In its order the Court expressed

21   concerns regarding the amount of the service payment, the clear sailing provision

22   and the attorneys' fees.  Id at 21, 23.

23   **III.    OVERVIEW OF SETTLEMENT TERMS**

24        The principal terms of the Agreement are as follows:

25        **A.    The Proposed Settlement Class**

26        All current and former non-exempt employees who worked for Defendants in

27   California during the time period of December 23, 2018 through the date of

28   preliminary approval of the settlement or October 1, 2022. Settlement Agreement at

**2**

1   ¶¶ Article I, c, h. "PAGA Group Members" means all Class Members employed by
2   Defendants at any time between September 7, 2020 through October 1, 2022
3   ("PAGA Period"). Settlement Agreement at ¶¶ Article I, c, cc. There are three
4   hundred seventy-six (376) individuals in the Settlement Class.  Salinas at ¶ 3.

5       **B.    Settlement Terms**

6       Under the Agreement, Defendants will pay Eight Hundred Thousand Dollars
7   and Zero Cents ($800,000.00) ("Gross Settlement Amount" or "GSA") to fully and
8   finally settle this matter.  Settlement Agreement at ¶ Article I, t.  In no event will
9   Defendants be required to pay more than the Gross Settlement Amount, except for
10  the employer's share of payroll taxes, which Defendants will pay separately from
11  and in addition to the Gross Settlement Amount.  No portion of the GSA will revert
12  to Defendants for any reason.  The following deductions from the GSA will be made,
13  subject to the Court's approval:

14          **1.    Class Representative's General Release Payment**

15      Subject to Court approval, Plaintiff shall receive a Service Enhancement not to
16  exceed $7,500 in consideration for a general release of all claims against Defendants.
17  Settlement Agreement at ¶ Article I, n The payment shall be made from the GSA.  If
18  the amount awarded is less than the amount requested, the difference shall become
19  part of the Net Settlement Amount ("NSA"). The payment is in consideration for a
20  general release of Plaintiff's claims against Defendants, his efforts in the litigation
21  and the risks he undertook for the benefit of the class. *See* Settlement Agreement at ¶
22  Article III, 3.06(d).

23          **2.    Attorneys' Fees and Costs**

24      Subject to Court approval, Plaintiff's Counsel shall request an award of
25  attorneys' fees in an amount of $264,000 (one third of the GSA). *See* Settlement
26  Agreement at ¶¶ Article I, e. This includes work remaining in documenting the
27  settlement, securing Court approval, ensuring the settlement is fairly administered,
28  and obtaining dismissal of the action. Also, subject to Court approval, Plaintiff's

Counsel shall request a reimbursement from the GSA for actual litigation costs in an amount not to exceed $15,000.00. *See* Settlement Agreement at ¶¶ Article I, e; Article III, 3.06(b).

### 3. Payment to the LWDA and PAGA Releasees

Subject to Court approval, the Agreement allots $50,000.00 to PAGA penalties. Seventy-five percent (75% or $37,500.00) of the PAGA Payment shall be paid to the Labor and Workforce Development Agency ("LWDA") and twenty-five percent (25% or $2,500.00) of the PAGA Payment will be distributed to the PAGA Group Members on a pro rata basis based on the number of workweeks that they worked from during the PAGA Period. *See* Settlement Agreement at ¶¶ Article I, s, bb.

There are three hundred thirty-four (334) Aggrieved Employees who worked a total of twenty-seven thousand seven hundred fifty-five (27,755) workweeks during the PAGA Period. Salinas Decl. at ¶ 13. The highest Individual PAGA Payment to be paid is approximately $48.57, and the average Individual PAGA Payment to be paid is approximately $37.43. Id.

### 4. Settlement Administration Expenses

After obtaining competing bids from administrators, the Parties have agreed to the appointment of Phoenix Settlement Administrators ("Phoenix") as the settlement administrator. *See* Settlement Agreement at ¶¶ Article I, mm. Phoenix is an experienced class administration company that has acted as claims administrator in numerous wage and hour cases. The Agreement allots an amount not to exceed $12,000.00 to administer the Settlement. *See* Settlement Agreement at ¶ Article I, ll.

The Administration Costs will be paid from the GSA. If Phoenix's actual costs or the amount awarded is less than the amount allotted in the Agreement, the difference shall become part of the NSA and distributable to Participating Class Members. These costs are reasonable, as Phoenix will mail notice packets to the class, maintain a website which has information about the Settlement and links to

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES**

the settlement documents, and keep track of objections and requests for exclusion from the Settlement. Should preliminary and final approval be granted by the Court, Phoenix will work with the Parties to facilitate the funding of the GSA, disbursement of all Court-approved payments, and disbursement of the NSA to Participating Class Members.

### 5.    Settlement Payments to Class Members

After all deductions have been made, it is estimated that $457,000 (i.e., the "Net Settlement Amount" or "NSA") will be available for disbursement to Participating Class Members (all Class Members who do not submit a valid and timely request to exclude themselves from this Settlement)[1]. The money available for payout to these individuals comes out of the NSA, which is what remains of the GSA after subtracting all Court approved attorneys' fees and costs, the Class Representative General Release Payments, Administration Costs, and the PAGA Payment. Each Class Member who does not timely opt-out of the Settlement will receive a *pro rata* share (their "Class Member Payment") of the NSA based on the number of weeks that he or she worked in each position covered by the Settlement. *See* Settlement Agreement at ¶¶ Article I, q; Article III, 3.06(f). Settlement Class Members have worked a collective total of fifty-thousand thirty-seven (50,037) Workweeks during the Class Period. Each Workweek is valued at approximately $9.13. Salinas Decl. at ¶10.

Based upon the calculations stipulated in the Settlement, the highest Individual Settlement Share to be paid is approximately $1,799.24, the lowest Individual

---

[1] The Net Settlement Amount of $457,000.00 available to pay Settlement Class Members was determined by subtracting the requested Class Counsel attorneys' fees ($264,000.00), and Class Counsel costs ($15,000.00), requested Enhancement Payment to Plaintiff Sandro Rodriguez ($5,000.00), the PAGA Amount ($50,000.00), and the requested Settlement Administration Costs ($9,000.00) from the Gross Settlement Amount ($800,000.00). Salinas Dec. at ¶11.

Settlement Share to be paid is approximately $2.61, while the average Individual Settlement Share to be paid is approximately $1,215.43. Id. at 12.

One-third of the Class Member Payment constitutes wages for the purposes of IRS reporting, and will be reported to the IRS pursuant to form W-2, while the other two-thirds constitutes payments for non-wage penalties, damages, and interest and will reported to the IRS pursuant to form 1099. The payment to the PAGA Group Members constitutes payments for non-wage penalties, damages, and interest and will reported to the IRS pursuant to form 1099. The Settlement Administrator (and not Defendants) will remit all federal and state taxes owed by Defendants and will issue W2s and 1099s on all funds distributed. *See* Settlement Agreement at ¶ Article III. 3.06(f).

### 6.      Funding and Distribution of Settlement Funds

Within fifteen (15) business days after the Date of Finality, Defendants shall transfer the Gross Settlement Amount, plus Defendants' share of employer-side payroll taxes, as set forth herein, into a QSF established by the Settlement Administrator either directly or by sending the funds to the Settlement Administer to be deposited and distributed. Settlement Agreement at ¶ Article III. 3.06(a). The Settlement Administrator will use these funds to fund payment of the Individual Settlement Payments, Class Counsel's Attorneys' Fees and Costs' Payment, the Enhancement Award, the LWDA Payment, and the Settlement Administration Costs. Id.

Within fifteen (15) business days after receiving Defendants' final payment funding the Gross Settlement Amount in full, the Settlement Administrator will pay the Individual Settlement Payments, Class Counsel's Attorneys' Fees and Costs' Payment, the LWDA Payment, the Enhancement Award, and employer and employee tax withholdings applicable to the Net Settlement Amount allocated to wages. Prior to this distribution, the Settlement Administrator will perform a search based on the National Change of Address Database to update and correct for

any known or identifiable address changes.  Id.

*See id.*

### 7. Uncashed Checks

Pursuant to the Agreement, a Participating Class Member and PAGA Group Member must cash his or her Class Settlement Share check, and any remaining Aggrieved Employees his or her Aggrieved Employee Payment check, within 180 calendar days after it is mailed to him or her.  If any check is not cashed within 180 days after its mailing to the Participating Class Member and PAGA Group Member, the Settlement Administrator will distribute the unclaimed funds represented by the uncashed check to Legal Aid of Los Angeles. *See* Settlement Agreement at ¶ Article III, 3.06(f).

## IV. Released Claims

In exchange for Defendants' promise to make the payments provided for in the Agreement, upon the Court's final approval of this Settlement, Participating Class Members will fully release and discharge the Released Parties from the Released Claims:

> All claims, demands, rights, liabilities, penalties, fees, and causes of action that were or could have been asserted by reason of or in connection with any matter or fact set forth or referred to in the operative complaint in the Action (whether in tort, contract, statute or otherwise) during the Class Period, including, but not limited to, for alleged violations of Labor Code sections 200, 201-203, 218.5, 221, 223, 226, 226.3, 226.7, 227.3, 500, 510, 512, 516, 1174.5, 1182.11-1182.12, 1194, 1194.2, 1197, 1198, 2802, 2699.3 et seq., 6400-6401, or any claims based on the following allegations: failure to pay minimum, regular, or hourly wages, and/or alleged off-the-clock work; failure to pay overtime wages or accurate overtime wages; failure to provide compliant meal periods; failure to provide compliant rest periods; failure to reimburse for necessary business expenses; failure to pay vacation wages; failure to pay timely wages during employment or upon separation; failure to provide accurate and/or complete wage statements; or violation of Cal. Bus. & Prof. Code section 17200 et seq. by engaging in the foregoing conduct. Released Claims include all claims for unpaid wages, overtime wages, statutory penalties, civil penalties, damages of any kind, interest, attorneys' fees, costs, injunctive relief, restitution, and any other equitable relief under California or federal statute, ordinance, regulation, common law, or other source of law, including but not limited to the California Labor Code, California Business & Professions

7

1   Code, California Civil Code, California Industrial Welfare Commission Wage Orders.

2   *See* Settlement Agreement at ¶ Article I, hh.

3   Additionally, all PAGA Group Members will release the Released Parties

4   from the Released PAGA Claims:

5   All claims, demands, rights, liabilities, penalties, fees, and causes
    of action under PAGA during December 23, 2018 through the
6   date of preliminary approval) including under Labor Code
    sections 558 and/or 2698 et seq., predicated on any Labor Code
7   violations alleged in the operative complaint in the Action (which
    include, but are not limited to, Labor Code sections 200, 201, 202,
8   203, 218.5, 221, 223, 226, 226.3, 226.7, 227.3, 500, 510, 512,
    516, 1174.5, 1182.11- 1182.12, 1194, 1194.2, 1197, 1198, 2802,
9   6400-6401) or that could have been alleged in the operative
    complaints in the Action based on the facts, policies, practices,
10  occurrences, or acts alleged in the operative complaints in the
    Action, or that are based on any failure to pay minimum, regular,
11  or hourly wages, and/or alleged off-the-clock work; failure to pay
    overtime wages or accurate overtime wages; failure to provide
12  compliant meal periods; failure to provide compliant rest periods;
    failure to reimburse for necessary business expenses; failure to
13  pay vacation wages; failure to pay timely wages during
    employment or upon separation; failure to provide accurate and/or
14  complete wage statements.

15  *See* Settlement Agreement at ¶ Article I, ii.

16  Only Plaintiff has agreed to a general release of all claims, including a waiver

17  under California *Civil Code* section 1542.  *See* Settlement Agreement at ¶ Article V,

18  5.03.

19  **V.    THE SETTLEMENT ADMINISTRATOR HAS DUTIFULLY**

20  **COMPLIED WITH THE NOTICE PROVISIONS AND THE COURT'S**

21  **PRELIMINARY APPROVAL ORDER**

22  **A.    Notice Procedures**

23  On February 6, 2023, Phoenix received a data file from Defense Counsel

24  that contained names, last known mailing addresses, Social Security numbers, and

25  workweeks for each Class Member ("Class List") during the Class Period. Salinas

26  at ¶3. The final mailing list contained three hundred seventy-six (376) individuals

27  identified as Class Members. On February 7, 2023, Phoenix conducted a National

28  Change of Address ("NCOA") search in an attempt to update the class list of

**8**

addresses as accurately as possible. Id. at ¶4. A search of this database provides updated addresses for any individual who has moved in the previous four (4) years and notified the U.S. Postal Service of their change of address. Id.

On February 22, 2023, Phoenix mailed the Notice via U.S. first class mail, in English and Spanish, to all three hundred seventy-six (376) Class Members on the Class List. Id. at ¶5. Only six (6) Notices were returned to Phoenix. Id. at ¶6. None were returned with a forwarding address. For the six (6) Notices returned from the Post Office without a forwarding address, Phoenix attempted to locate a current mailing address using TransUnion TLOxp, one of the most comprehensive address databases available for skip tracing. Of the six (6) Notices that were skip traced, updated addresses were obtained for each and the Notice was promptly re-mailed to those Class Members via first class mail.

**B.    Class Members' Responded Overwhelmingly Favorably to the Settlement**

**1. There were No Objections, Exclusions or Disputes By Class Members**

The Parties can proudly report that 100% of the Class elected to participate in the Settlement. Salinas Decl. ¶ 10. Additionally, there were no objections to the settlement and no disputes. Id at ¶¶8, 9.

**VI.    ANALYSIS**

**A.    Class Certification Is Appropriate**

When presented with a motion for final approval of a class action settlement, a court first evaluates whether certification of the Settlement Class is appropriate under Federal Rule of Civil Procedure 23(a) and (b). Rule 23(a) provides that a class action can be maintained if four requirements are met: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. See Fed. R. Civ. P. 23(a)(1)-(4). As relevant here, settlement certification of a Rule 23(b)(3) class requires that (1) "the questions of law or fact common to Settlement Class

1   members predominate over any questions affecting only individual members" and

2   (2) "a class action [be] superior to any other available methods for fairly and

3   efficiently adjudicating the controversy." See Fed. R. Civ. P. 23(b)(3).

4   Additionally, plaintiffs seeking conditional certification of an FLSA collective

5   action must show that they are "similarly situated" to other employee class

6   members. *Litty v. Merrill Lynch & Co*., No. cv 14-0425 PA (PJWX), 2015 WL

7   4698475 (C.D. Cal. Apr. 27, 2015) at *6; see also *Lewis v. Wells Fargo Co*., 669 F.

8   Supp. 2d 1124 (N.D. Cal. 2009) 1127.

9       The Court analyzed these factors in its Preliminary Approval Order and

10  there is no reason to disturb its earlier conclusions. See *O'Connor v. Uber Techs.,*

11  *Inc.,* No. 13-cv-03826-EMC, 2019 WL 4394401 (N.D. Cal. Sept. 13, 2019) at *4.

12  The requirements of Rule 23(a) and (b)(3) were satisfied then as they are now. See

13  Doc. 26 at 7-13. There have been no changes to the class impacting the

14  numerosity, commonality, typicality, and adequacy of representation factors. Nor

15  have any questions of law or fact common to the Settlement Class been subsumed

16  by questions affecting only individual Settlement Class members. Id. Most

17  importantly, the notice procedure authorized by the Court has resulted in an

18  overwhelmingly positive reaction by the Settlement Class members, since none

19  opted out or objected to the Settlement.

20      Simply, there is no reason for the Court, therefore, to depart from its

21  previous conclusion that the Settlement Class meets the certification requirements

22  of Rule 23. Plaintiffs urge the Court to confirm its previous certification of the

23  Settlement Class.

24      **B.    The Court Should Grant Final Approval Under Fed.R.Civ.P. 23**

25          **1.    Legal Standard**

26      The Ninth Circuit has a " 'strong judicial policy that favors settlements,

27  particularly where complex class action litigation is concerned.' " *Brooks v. Life*

28  *Care Centers of Am., Inc*., No. SACV1200659CJCRNBX, 2015 WL 13298569

**10**

1   (C.D. Cal. Oct. 19, 2015) at *2 citing *Linney v. Cellular Alaska P'ship*, 151 F.3d
2   1234 (9th Cir. 1998) 1238. A class action however, may only be settled with court
3   approval. Fed. R. Civ. P. 23(e). Where, as here, the proposed settlement will bind
4   the Settlement Class members (by, e.g., releasing their claims), the Court must find
5   that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "In
6   this Circuit, a district court examining whether a proposed settlement comports
7   with Rule 23(e)(2) is guided by the eight '*Churchill* factors,'" viz., "(1) the
8   strength of the plaintiff's case; (2) the risk, expense, complexity, and likely
9   duration of further litigation; (3) the risk of maintaining class action status
10  throughout the trial; (4) the amount offered in settlement; (5) the extent of
11  discovery completed and the stage of the proceedings; (6) the experience and
12  views of counsel; (7) the presence of a governmental participant; and (8) the
13  reaction of the class members of the proposed settlement." *Kim v. Allison*, 8 F.4th
14  1170 (9th Cir. 2021), 1178.

15              **2.    The *Churchill* Factors Support Approval of the Settlement**
16                    **a.    The Strength of Plaintiff's Case**

17
18         Here, each Participating Class Member will receive a meaningful sum—
19  payouts will depend on the number of qualifying workweeks worked by each class
20  member, but the average payment to class members is estimated to be about
21  $37.43. (Salinas. ¶ 13.) This presents a fair compromise in light of the risks and
22  expense of continued litigation. Although the settlement was relatively early in the
23  litigation, the parties had a clear view of the strengths and weaknesses of their
24  positions.

25         Specifically, the parties had the benefit of significant informal discovery,
26  including written policies produced by Defendants as well as a sampling of
27  employee payroll and timekeeping data, as well as a full day of mediation.
28  (Grombacher Decl. ¶ 18.) With that information, the parties were able to

1  realistically value Defendants' liability and assess the risk of moving forward with

2  class certification, motion practice, and trial. The $800,000 settlement amount

3  represents about 13% of Defendants' potential exposure in this case[2]. (Id. ¶ 23.)

4  Again, like the monetary recovery, this percentage compares favorably with

5  similar cases particularly given that Plaintiff faced significant hurdles to recovery.

6  While Plaintiff is confident that he has strong claims, he also recognizes that if the

7  litigation had continued, they may have encountered legal and factual hurdles that

8  could have prevented the Class from obtaining any recovery. For example,

9  although a number of cases have found wage and hours actions to be especially

10  amenable to class resolution, [3]  several have gone the other way, finding that some

11  of the very claims at issue here were not suitable for class adjudication because

12

13

14  _____

15      [2] See, e.g., See, e.g., *Aqui v. Sutton Foundation, Inc*., Case No. 30-2008-00180062

16  (Orange County Super. Ct.) (average net recovery of approximately $445); *Badami v.
   Grassroots Campaigns, Inc*., Case No. C 07-03465 JSW (N.D. Cal. Sept. 15, 2008)

17  (average net recovery of approximately $195); *Sandoval v. Nissho of Cal., Inc.,* Case No.
   37-2009-00091861 (San Diego County Super. Ct.) (average net recovery of approximately

18  $145); *Fukuchi v. Pizza Hut*, Case No. BC302589 (L.A. County Super. Ct.) (average net
   recovery of approximately $120); *Contreras v. United Food Group, LLC*, Case No.

19  BC389253 (L.A. County Super. Ct.) (average net recovery of approximately $120); *Ressler
   v. Federated Department Stores, Inc.,* Case No. BC335018 (L.A. County Super. Ct.)

20  (average net recovery of approximately $90); *Doty v. Costco Wholesale Corp*., Case No.
   CV05-3241 FMC-JWJx (C.D. Cal. May 14,2007) (average net recovery of approximately

21  $65); *Sorenson v. PetSmart, Inc.,* Case No. 2:06-CV-02674-JAM-DAD (E.D. Cal.)
   (average net recovery of approximately $60); *Lim v. Victoria's Secret Stores, Inc.,* Case No.

22  04CC00213 (Orange County Super. Ct.) (average net recovery of approximately $35); and
   *Gomez v. Amadeus Salon, Inc.,* Case No. BC392297 (L.A. Super. Ct.) (average net

23  recovery of approximately $20).

24

25      [3] See e.g. *Brinker v. The Superior Court of San Diego,* 53 Cal. 4th (2012) at 1033

26  ("Claims alleging that a uniform policy consistently applied to a group of employees is in
   violation of the wage and hour laws are of the sort routinely, and properly, found suitable

27  for class treatment... The theory of liability - that [the employer] has a uniform policy, and
   that that policy, measured against wage order requirements, allegedly violates the law - is

28  by its nature a common question eminently suited for class treatment.").

they raised too many individualized issues[4]. Some courts have denied certification even when an employer's policies are unlawful on their face. For instance, in *Ordonez v. Radio Shack, Inc*., 2013 U.S. Dist. LEXIS 7868 (C.D. Cal. Jan. 17,2013) *35-41, the court denied certification even though the plaintiff submitted evidence of a facially unlawful policy regarding rest breaks. The *Ordonez* court concluded that the predominance and superiority elements were not met based on the employer's presentation of anecdotal evidence of lawful compliance notwithstanding the unlawful policy. Id. at *38-40.

Given the discretion accorded to the district court, even a relatively strong case on the merits may not satisfy the standards for certification on a contested motion. This reality added to the risk of continued litigation and militated in favor of settlement. Indeed, it is usually preferable to reach an early resolution of a dispute because such resolutions save time and money that would otherwise go to litigation. For example, if this action had settled following additional litigation, the settlement amount would likely have taken into account the additional costs incurred, and there may have been less available for Class Members.

Certification, however, was not the only potential bar to recovery.

---

[4] See *Ali v. USA. Cab Ltd*., 176 Cal. App. 4th 1333,1341 (2009) (denying certification because employees' declarations attesting to having taken meal and rest breaks demonstrated that individualized inquiries were required to show harm); Campbell v. Best Buy Stores, L.P., 2013 U.S. Dist. LEXIS 137792, at *30-41 (C.D. Cal. Sept. 20,2013) (following Brinker and denying certification of proposed off-the-clock and rest and meal break classes due to lack of uniform policy); *Jimenez v. Allstate Ins. Co*., 2012 U.S. Dist. LEXIS 65328 (C.D. Cal. Apr. 18 2012) (denying motion to certify meal and rest break classes based on employer's practice of understaffing and overworking employees) *Gonzalez v. Officemax N. Am*., 2012 U.S. Dist. LEXIS 163853 (C.D. Ca. Nov. 5,2012) (same); *Brown v. Fed Express Corp.,* 249 F.R.D. 580, 587-88 (C.D. Cal. 2008) (denying certification of driver meal and rest period claims based on the predominance of individual issues); Kenny v. Supercuts, Inc., 252 F.R.D. 641,645 (N.D. Cal. 2008) denying certification on meal periods claim); *Blackwell v. Skywest Airlines, Inc.*, 245 F.R.D. 453,467-68 (S.D. Cal. 2007) (declining to certify class action because individual issues predominated when different employee stations provided different practices with respect to meal periods).

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES**

1    Defendants would have argued that they maintained lawful policies and practices,

2    including policies requiring employees to record all time worked, prohibiting off-

3    the-clock work, providing employees with compliant meal and rest breaks (and

4    paying premiums when appropriate), and reimbursing employees for business

5    expenses as required by law. As such, Plaintiff would have to offer extensive

6    evidence to establish that Defendants did not, in fact, conform to such policies.

7          For example, as to Plaintiff's "overtime calculation" claim, evidence

8    established that Defendants pay shift differentials to employees who work eligible

9    shifts (typically the night shift), and correctly includes shift differential pay in the

10   regular rate of pay for purposes of calculating overtime. Similarly, Defendants also

11   appeared to pay meal period premiums at the higher shift differential rate, which

12   comports with the recent decision in *Ferra v. Loews Hollywood Hotel, LLC*, 11

13   Cal. 5th 858 (2021).  While there was a dispute regarding whether bonuses paid to

14   employees were discretionary or non-discretionary, Defendants paid so few

15   bonuses during the Class Period that the damages were *de minimus*.

16         Similarly, as to the meal break claims, the time records reveals that only 7%

17   of all eligible meal periods appear on their face to be noncompliant (i.e., missed,

18   late, or short) during the Class Period.

19              **b.    The Risk, Expense, Complexity and Likely Duration of**

20                     **Further Litigation & the Risk of Maintaining Class**

21                     **Action Status through Trial**

22         "A[ ] central concern [when evaluating a proposed class action settlement] ...

23   relate[s] to the cost and risk involved in pursuing a litigated outcome." Fed. R. Civ.

24   P. 23(e), 2018 Advisory Committee Notes. In evaluating this factor, the Court "must

25   stop short of the detailed and thorough investigation that it would undertake if it

26   were actually trying the case[.]" *Ochinero v. Ladera Lending, Inc*., No.

27   SACV191136JVSADSX, 2021 WL 4460334, at *5 (C.D. Cal. July 19, 2021)

28   (quoting *Kullar v. Foot Locker Retail, Inc*., 168 Cal. App. 4th 116, 130 (2008)). "In

**14**

1   the context of a settlement ... the test is not the maximum amount plaintiffs might

2   have obtained at trial on the complaint, but rather whether the settlement is

3   reasonable under all of the circumstances." *Ochinero,* 2021 WL4460334, at *5

4   (quoting *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 250 (2001)).

5       Here, the Court has already assessed the strength of Plaintiffs' case and future

6   risk. (Order at 17-18.)   As the Court noted, and as discussed above, Plaintiff "would

7   face significant risks in maintaining this action." (Order at 17.)

8                      **c.    The Amount Offered In Settlement**

9       When considering the fairness and adequacy of the amount offered in

10  settlement, "it is the complete package taken as a whole, rather than the individual

11  component parts, that must be examined for overall fairness." *Bellinghausen v.*

12  *Tractor Supply Co*., 306 F.R.D. 245, 256 (N.D. Cal. 2015) (citation omitted). "The

13  fact that a proposed settlement may only amount to a fraction of the potential

14  recovery does not, in and of itself, mean that the proposed settlement is grossly

15  inadequate and should be disapproved." *Linney v. Cellular Alaska P'ship,* 151 F.3d

16  1234,1242 (9th Cir. 1998) (internal citation and quotation marks omitted).

17      As the Court noted in its preliminary approval Order, the amount offered in

18  settlement here ($800,000) is within the "ballpark range of percentages of recovery

19  in other wage-and-hour class actions". (Order at 18.) While Plaintiff had originally

20  estimated the value of the settlement to claims to be about 13%, in reviewing his

21  damage analysis, even looking at the numbers conservatively, the percentage is much

22  closer to 20%. The Court, however, had noted that Plaintiff failed to adequately

23  explain how he arrived at the prior 13% estimate. Plaintiff shall do so now. While

24  there were certainly variables in preparing the damage model, Plaintiff estimated

25  liability as follows:

26  **Failure to Pay All Wages**

27      Plaintiff, in conjunction with his expert, reviewed Defendants records,

28  performed extrapolations and calculated Defendants' exposure for this claim to be

15

1   only $6,821.

2   **Failure to Provide Meal and Rest Periods**

3       Based upon the data and assumptions culled from interviews with Plaintiff and

4   other class members, performing extrapolations and accounting for premiums paid,

5   Plaintiff and his expert valued this claim at $974,503 assuming a rest break violation

6   rate of 100%[5].

7   **Failure to Reimburse for Business Expenses & Provide Safety Devices**

8       Based upon the policies, data and assumptions Plaintiff and his expert valued

9   this claim at $52,406.

10  **Failure to Pay Vacation Wages**

11      Based on Defendants' policies, Plaintiff and his expert calculated the value of

12  Plaintiff's vacation claim to be approximately 58,000.

13  **Failure to Provide Complaint Wage Statements**

14      Based upon the claims, Plaintiff and his expert determined that Defendant's

15  liability for this derivative claim would be $232,600.

16  **Failure to Pay Wages at Termination**

17      Based upon Defendants' records extrapolated to the class, Plaintiff and his

18  expert determined that Defendants' liability for the waiting time claims would be

19  $394,490.

20  **PAGA Penalties**

21      While PAGA penalties are discretionary and thus difficult to accurately

22  estimate, assuming the full statutory penalties were awarded and stacked, Plaintiff

23  and his expert calculated the liability for PAGA penalties at $1,563,800.

24  **Total Liability**

25  _____

26  [5] As noted in the motion for preliminary approval, Defendants' liability for the meal breaks

was very minimal, amounting to only $58,317 in damages. Only .7% of first meal breaks

27  were less than 30 minutes in duration. Similarly, only .7% of meal-eligible shifts failed to

record a meal period. In total, the percentage of unique meal break violations over all shifts

28  analyzed was only 6.2%.

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES

1    In total, including interest in the amount of $112,530, Plaintiff and his expert

2    calculated Defendants' liability conservatively to be $3,282,620.

3    Thus, the amount of the recovery factor weighs in favor of final approval.

4    **d.    The Extent of the Discovery and the Stage of the**

5    **Proceedings**

6    As this Court noted in its preliminary approval Order, as evidence of the

7    adequacy of their representation, Class Counsel have engaged in investigation and

8    informal discovery in this action. Order at 16. The investigation has included,

9    among other things: (a) inspection and analysis of the documents produced by

10    Defendants, which included information pertaining to the putative class members'

11    work schedules, workplace policies, meal period practices, and pay practices; (b)

12    detailed class member data relating to platform assignments, rates of pay, and data

13    concerning all shifts/hours worked; (c) interviews of numerous members of the

14    putative class; (d) analysis of potential class-wide damages; (e) analysis of the

15    legal positions taken by Defendants and Plaintiff; and (f) research of the applicable

16    law with respect to the claims asserted in the Action and the potential defenses

17    thereto.   Grombacher Decl. at ¶9.    This factor also weighs in favor of final

18    approval.

19    **e.    The Experience and Views of Counsel**

20    Class Counsel herein are well qualified and, as detailed in the supporting

21    declarations filed with this motion, have substantial experience litigating and

22    settling complex employment law actions involving the same issues raised by this

23    case, including prior class action experience with these same legal issues. See

24    Grombacher Decl. ¶38; Declaration of Raul Perez "Perez Decl." at ¶¶ 18-19.

25    Class Counsel believe that the claims, allegations and contentions asserted in

26    the Action have merit. Grombacher Decl. at ¶ 30. However, they recognize and

27    acknowledge the expense and delay of the lengthy proceedings necessary to

28    prosecute the Action against Defendant through trial and appeals. Id.   Class

Counsel are also mindful of the inherent problems of proof under, and possible defenses to, the claims alleged in the Action. In light of the preceding potential risks, Class Counsel believe that the terms set forth in the Settlement confer substantial benefits upon Plaintiffs and each of the other members of the Settlement Class, and that an independent review of the Settlement Agreement by the Court in the approval process will confirm this conclusion. Grombacher Decl. at ¶ 44. Based on their own independent investigation and evaluation, Class Counsel have determined that the terms set forth in the Settlement Agreement are in the best interests of Plaintiff and the other members of the Settlement Class. Id. at ¶ 66; Perez Decl. at ¶ 6.

This factor weighs in favor of final approval.

### f.    Presence of a Government Participant

Technically, there is no governmental participant in this action, since no state or federal agency is a party. However, the Settlement does provide relief under PAGA. PAGA requires the parties to submit a proposed settlement of a PAGA action to the California Labor and Workforce Development Agency ("LWDA") at the same time as they seek approval of the settlement by the court. Lab. Code § 2699(l)(2). Here, Class Counsel submitted the Settlement to the LWDA on May 4, 2023. Grombacher Decl. at ¶ 61. The LWDA never filed an objection to the Settlement, nor has the LWDA participated in any way in this action. This factor, therefore, favors approval of the Settlement.

### g.    The Reaction of the Class Has Been Overwhelmingly Positive Which Weighs in Favor of Approval

The response of the Class favors approval of the Settlement in every respect. The deadline to object or seek exclusion from the settlement was April 8, 2023. Salinas Decl at ¶¶7,8.   Zero objections to the final settlement have been filed with the Court, and each of the three hundred seventy-six (376) has elected to participate in the settlement. Id. at ¶¶7-10.   A low opt-out rate such as this (0.3%) suggests the

1   support of class members and counsels in favor of approval. *See Nat'l Coal. of Ass'ns*

2   *of 7-Eleven Franchisees v. Southland Corp.*, 210 F.3d 384 (9th Cir. 2000) (finding

3   that a .6% opt-out rate suggests "that the settlement was a favorable one"). Here, the

4   reaction of the Settlement Class members even more strongly favors approval of the

5   Settlement.

6   <h3 align="center">h.    The Attorney's Fees Sought Are Reasonable</h3>

7   Plaintiff has separately filed his motion for attorney's fees, which the Court

8   may use to evaluate this *Churchill* factor. Plaintiff one third percent of the maximum

9   settlement amount. Settlement at ¶ XII. Any amount not awarded will revert to the

10  Class for distribution on a pro rata basis. Id. Finally, no member of the Class has

11  objected to the proposed award of fees.

12  <h3 align="center">i.    The Incentive Award Is Reasonable</h3>

13  As detailed in Plaintiff's previously filed Motion for Approval of Attorney's

14  Fees, Costs and Service Payment (Dkt. No. x.) the service payment is reasonable and

15  should be approved.

16  **C.    The PAGA Settlement Should be Approved**

17  The Settlement includes a PAGA payment of $50,000, with $37,500 (75% of

18  the $50,000) being paid to the California Labor and Workforce Development

19  Agency, and $12,500 (25% of the $50,0000) being paid to class members as part of

20  the net settlement amount. This result was reached after good-faith negotiation

21  between the parties.

22  "An employee bringing a PAGA action does so as the proxy or agent of the

23  state's labor law enforcement agencies,... who are the real parties in interest." *Sakkab*

24  *v. Luxottica Retail N. Am. Inc.*, 803 F.3d 425, 435 (9th Cir. 2015) (internal citations

25  omitted). Any PAGA judgment binds not only members of the class, but similarly

26  situated workers who opt out of the class and the state's labor law enforcement

27  agencies. *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2014). A court analyzing the

28  compromise of a PAGA claim must consider whether the settlement is

1    "'fundamentally fair, reasonable, and adequate' with reference to the public policies

2    underlying the PAGA." *O'Connor v. Uber Technologies, Inc.,* 201 F. Supp. 3d at

3    1133 (N.D. Cal. 2016) (citation omitted). However, neither the PAGA nor the

4    California state court has established any specific standard for evaluating PAGA

5    settlements. See *Ramirez v. Benito Valley Farms, LLC*, No. 16-4708, 2017 WL

6    3670794, at *3 (N.D. Cal. Aug. 25, 2017). The Court refers to the factors in *Hanlon*

7    *v. Chrysler Corp*., 150 F.3d 1011, 1026 (9th Cir. 1998), to evaluate the PAGA

8    settlement. See *Pena v. Taylor Farms Pac., Inc.,* No. 13-1282, 2021 WL 916257, at

9    *7-8 (E.D. Cal. Mar. 10, 2021); *McClure v. Waveland Services, Inc.*, No. 2:18-cv-

10    01726-KJM-AC, 2021 WL 5204151, at *6 (E.D. Cal Nov. 09, 2021).

11        The *Hanlon* factors, designed for use in evaluating class action settlements,

12    include (1) the strength of a plaintiff's case; (2) the risk, expense, complexity and

13    likely duration of further litigation; (3) the risk of maintaining class action status

14    throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery

15    completed; (6) the expertise and views of counsel; (7) the presence of government

16    participation; and (8) the reaction of class members to the proposed settlement. See

17    *Hanlon*, 150 F.3d at 1026.

18        Each of these factors was addressed hereinabove, though they nevertheless

19    require some additional discussion in the context of PAGA.

20        Plaintiffs valued their PAGA claim at approximately $1,563,800 in maximum

21    exposure. Grombacher Supp. Decl. at ¶ 5. However, the Court has discretion to

22    "award a lesser amount than the maximum civil penalty amount specified by [the

23    PAGA] if, based on the facts and circumstances of the particular case, to do

24    otherwise would result in an award that is unjust, arbitrary and oppressive, or

25    confiscatory." Lab. Code § 2699(e)(2); see *Cotter v. Lyft, Inc*., 193 F. Supp. 3d 1030,

26    1037 (N.D. Cal. 2016) ("if the case went to judgment and if the drivers prevailed, the

27    Court would very likely reduce the award of PAGA penalties by a substantial

28    amount."). Thus, even if Plaintiff was to prevail on all of his claims for PAGA

penalties, it is possible the Court would substantially reduce the penalties award. Plaintiff factored in this risk of substantial reduction in their agreed-to PAGA allocation.

Plaintiff reasonably chose to compromise their PAGA penalties in light of the risks of continued litigation. Plaintiff's' PAGA claims are derivative of their California Labor Code claims. The merits of their Labor Code claims, therefore, are the same merits of their PAGA claims. The Court has already recognized the significant risks in pursuing these state law claims. This same logic applies with equal force to Plaintiff's derivative PAGA claims, so a negotiated settlement of the PAGA claims that results in a monetary recovery for the PAGA members is preferable to protracted litigation that could result in a defense verdict.

Finally, the PAGA allocation is appropriate, as measured as a percentage of the gross settlement amount. While it is true that the PAGA portion of the settlement is a small fraction of the total potential liability, California courts routinely approve class action settlements with small PAGA allocations compared to the maximum possible PAGA recovery. See *Contreras v. Worldwide Flight Servs., Inc.,* No. CV 18-6036 PSG (SSX), 2020 WL 2083017, at *10 (C.D. Cal. Apr. 1, 2020). Rather than evaluate the PAGA allocation against the total potential PAGA penalties, courts tend to look instead at the PAGA allocation as a percentage of the gross settlement. Id. Using this approach, courts approve PAGA allocations in the range of between zero to two percent of the gross settlement amount. Id.; see, e.g., *In re M.L. Stern Overtime Litig.*, No. CV 07-0118 BTM (JMAx), 2009 WL 995864, at *1 (S.D. Cal. Apr. 13, 2009) (approving PAGA settlement of 2 percent); *Hopson v. Hanesbrands, Inc.,* No. CV 08-0844 EDL, 2008 WL 3385452, at *1 (S.D. Cal. Apr. 13, 2009) (approving a PAGA settlement of 0.3 percent); *Wise v. Ulta Salon, Cosmetics & Fragrance, Inc*., No. 17-853, 2020 WL 1492672, at *5 (E.D. Cal. Mar. 27, 2020) (approving PAGA penalty equal to approximately 2 percent of gross settlement). Here, the PAGA allocation ($50,000) represents approximately 6.25% percent of the

Gross Settlement Amount. This agreed-upon PAGA allocation, because it is higher than the usual range of zero to two percent of the gross settlement, does not raise concerns that Plaintiff is skirting the "special responsibility to [his] fellow aggrieved workers" or using the PAGA claim "merely as a bargaining chip, wherein the rights of individuals ... may be waived for little additional consideration in order to induce the employer to agree to a settlement." *O'Connor*, 201 F. Supp. 3d at 1134. These factors favor approval of the PAGA settlement.

**VII.   CONCLUSION**

        The parties have negotiated a fair and reasonable settlement. Accordingly, Plaintiff moves the Court to grant final approval of the Settlement Agreement.

DATED:  May 4, 2023                    **BRADLEY/GROMBACHER, LLP**
                                       **CAPSTONE LAW APC**


                              By:   */s/ Kiley Grombacher*
                                    Marcus Bradley, Esq.
                                    Kiley Grombacher, Esq.
                                    Lirit King, Esq.
                                    Orlando Villalba, Esq.

                                    Attorneys for Plaintiff