JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SANDRO RODRIGUEZ, on behalf of himself and all others similarly situated and all aggrieved employees,

        Plaintiff,

     v.

MITSUBISHI CHEMICAL CARBON FIBER AND COMPOSITES, INC.; MITSUBISHI CHEMICAL HOLDINGS AMERICA, INC.; MITSUBISHI CHEMICAL AMERICA, INC.; and DOES 1 to 10, inclusive,

        Defendants.

Case No.: SACV 21-01711-CJC (JDEx)

ORDER GRANTING IN SUBSTANTIAL PART PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT [Dkt. 30] AND MOTION FOR ATTORNEYS' FEES AND COSTS [Dkt. 27]

## I.    INTRODUCTION

In this putative class action, Plaintiff Sandro Rodriguez brings various wage-and-hour claims under California's labor laws against Defendants Mitsubishi Chemical

Carbon Fiber and Composites, Inc., Mitsubishi Chemical Holdings America, Inc., and Mitsubishi Chemical America, Inc.  Those claims include (1) failure to pay all wages due, (2) failure to provide compliant meal periods and pay missed meal period wages, (3) failure to provide compliant rest periods and pay missed rest period wages, (4) failure to reimburse for business expenses, (5) failure to pay vacation wages, (6) failure to provide safety devices, (7) failure to furnish in a timely manner accurate itemized wage statements, (8) failure to pay wages at the time of termination, and (9) violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–17210.  (*See* Dkt. 22 [First Amended Class Action and PAGA Representative Action Complaint, hereinafter "FAC"] at 17–28.)  Rodriguez also brings (10) a representative action for civil penalties for violating the state's labor laws under the Private Attorneys General Act of 2004 ("PAGA"), Cal. Lab. Code §§ 2698–2699.8.  (*See* FAC at 28–31.)

On January 18, 2023, the Court conditionally certified a plaintiff class and preliminarily approved a settlement between the class and Defendants.  (*See* Dkt. 26 [Order Granting in Substantial Part Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement, hereinafter "Order"].)  Now before the Court is Rodriguez's unopposed motion for final approval of the proposed class action settlement, which includes approval of the PAGA settlement, and motion for attorneys' fees and costs.  (*See* Dkt. 27 [Plaintiff's Notice of Motion and Motion for Final Approval of Class Action Settlement; Memorandum of Points and Authorities, hereinafter "Settlement Mot."]; Dkt. 30 [Plaintiff's Notice of Motion and Motion for Attorneys' Fees and Costs; Memorandum of Points and Authorities, hereinafter "Fees Mot."].)  For the following reasons, the motion is **GRANTED IN SUBSTANTIAL PART**.

//
//
//
//

## II.   BACKGROUND

### A.   Factual Allegations

At the times relevant to this action, Sandro Rodriguez was and is a resident and domiciliary of California.  (*See* FAC ¶ 12 at 4.)  He was an employee of Defendants from approximately February 2005 to April 21, 2021.  (*See id.* ¶ 12 at 4–5.)  His title was "Machine Operator 1," and he worked at Defendants' factory at 1822 Reynolds Avenue in Irvine, California.  (*See id.* ¶ 12 at 5.)

According to Rodriguez, he and other non-exempt employees of Defendants experienced violations of California's wage-and-hour laws.  Defendants required employees to be at their workstation at their start time, which meant that employees would typically enter the building at least ten minutes before the start time to change into uniforms and to don required personal protective equipment—time for which they were not compensated.  (*See id.* ¶ 12 at 9.)  They also were not compensated for answering work calls after their shifts, waiting to be let into facilities before shifts, submitting to mandatory health screenings and drug tests, or accrued but unused vacation time.  (*See id.* ¶¶ 13–14, 33 at 9, 11.)  Further, Defendants had a policy of not paying overtime wages or the correct rate of overtime wages.  (*See id.* ¶ 17 at 9.)  Defendants failed regularly to provide employees meal periods or rest periods, to provide meal periods uninterrupted by supervisors, and to allow employees to leave the premises during rest periods.  (*See id.* ¶¶ 21–24, 27–28 at 10–11.)  And Defendants had a policy or practice of not adequately reimbursing or indemnifying employees for expenses and for safety devices for their jobs, such as mileage for mandatory drug testing, uniform expenses like steel-toed boots, and personal cell phone usage to speak with supervisors.  (*See id.* ¶¶ 30–31, 35 at 11–12.)  Defendants further failed to provide the employees accurate, itemized wage statements, including accurate information on wages, hours, applicable rates of pay,

and the correct entity address and to pay all wages upon termination.  (*See id.* ¶ 37, 39–40 at 12–13.)  And these practices amounted to unlawful, unfair, or fraudulent business practices that allowed Defendants to gain an advantage over competitors.  (*See id.* ¶¶ 41–43 at 13.)

### B.    Settlement Terms

As part of the settlement, Defendants have agreed to pay a non-reversionary Gross Settlement Amount of $800,000, from which certain expenses are deducted to yield the Net Settlement Amount.  (*See* Dkt. 23-1 Ex. A [Joint Stipulation of Settlement and Release, hereinafter "Agreement"] art. I, ¶¶ t, x; *id.* § 3.06(a).)  Each individual class payment is to be prorated based on the number of weeks that an employee was a class member—i.e., a non-exempt employee who worked for Defendants in California during the class period, from December 23, 2018, through October 1, 2022.  (*See id.* art. I, ¶¶ c, q; *id.* § 3.06(f).)  This apportionment accounts for timely requests to be excluded from the class.  (*See id.* art. I, ¶ dd; *id.* § 3.06(f).)  $50,000 of the Gross Settlement Amount is allocated as the PAGA Settlement Amount, 75% of which is to be paid pursuant to California law to the Labor and Workforce Development Agency ("LWDA").  (*See id.* art. I, ¶ bb; *id.* § 3.06(e)–(f).)  The remaining 25% is to be allocated based on the number of workweeks that each employee was a PAGA group member—i.e., a class member employed by Defendants during the PAGA period, from September 7, 2020, through October 1, 2022.  (*See id.* art. I, ¶ cc; *id.* § 3.06(f).)  Individuals may not opt out of the PAGA portion of the settlement.  (*See id.* § 3.04(b).)  For tax purposes, one third of each settlement payment constitutes wages, and the rest are deemed penalties and interest.  (*See* § 3.06(f).)  Defendants are separately paying for employer payroll taxes on the wages.  (*See id.*)  Any uncashed checks for individual settlement amounts are to be distributed as *cy pres* to Legal Aid of Los Angeles.  (*See id.* § 3.06(f).)

As noted, certain deductions from the Gross Settlement Amount are made before apportionment and distribution.  (*See id.* art. I, ¶ x; *id.* § 3.06.)  These deductions include administrative costs incurred by the settlement administrator, which may not exceed $12,000.  (*See id.* art. I, ¶ *ll*; *id.* § 3.02.)  Also deducted are attorneys' fees, not to exceed 33% of the Gross Settlement Amount, i.e., $264,000, litigation costs, not to exceed $15,000, (*see id.* art. I, ¶ e; *id.* § 3.06(b)), and Rodriguez's incentive award for his efforts for the class, not to exceed $7,500, (*see id.* art. I, ¶ n; *id.* § 3.06(d)).  The agreement includes a "clear sailing" arrangement, whereby Defendants agreed not to object to an application for fees and costs within these limits.  (*See id.* § 3.06(b).)  Finally, the 75% of the PAGA portion of the Gross Settlement Amount to be distributed to the LWDA is deducted from the Gross Settlement Amount.  (*See id.* § 3.06(e).)

The agreement also prescribed a provisional plan for class notice.  (*See id.* § 3.03.)  The administrator sends by first-class U.S. mail a form notice, attached as an exhibit to the agreement, describing the terms of the agreement and procedures to opt-out and object as well as an estimate of each member's share of the Net Settlement Amount.  (*See id.*)  The names, addresses, and other information to effectuate notice come from Defendants' records.  (*See id.* art. I, ¶ f; *id.* § 3.03.)  And the notice provides the administrator's toll-free phone number and mailing address, as well as the contact information for the putative class counsel, for members to use if they have questions.  (*See id.* Ex. A [Notice of Class Action Settlement, hereinafter "Notice"] at 6–7.)  The administrator also mails the individual settlement checks to the members.  (*See* Agreement § 3.03.)

In exchange for Defendants' settlement sum, class members release "Defendants, including their past or present directors, shareholder, employees, agents, principals, heirs, representatives, accountants, auditors, attorneys, consultants, insurers, and their

respective successors and predecessors in interest, assigns, subsidiaries, affiliates, and

parents," (*id.* art. I, ¶ jj), of all "Released Claims," (*see id.* § 5.01).

> "Released Claims" means the release of the Released Parties from all claims,
> demands, rights, liabilities, penalties, fees, and causes of action that were or
> could have been asserted by reason of or in connection with any matter or
> fact set forth or referred to in the operative complaint in the Action (whether
> in tort, contract, statute or otherwise) during the Class Period, including, but
> not limited to, for alleged violations of Labor Code sections 200, 201-203,
> 218.5, 221, 223, 226, 226.3, 226.7, 227.3, 500, 510, 512, 516, 1174.5,
> 1182.11-1182.12, 1194, 1194.2, 1197, 1198, 2802, 2699.3 et seq., 6400-
> 6401, or any claims based on the following allegations: failure to pay
> minimum, regular, or hourly wages, and/or alleged off-the-clock work;
> failure to pay overtime wages or accurate overtime wages; failure to provide
> compliant meal periods; failure to provide compliant rest periods; failure to
> reimburse for necessary business expenses; failure to pay vacation wages;
> failure to pay timely wages during employment or upon separation; failure to
> provide accurate and/or complete wage statements; or violation of Cal. Bus.
> & Prof. Code section 17200 et seq. by engaging in the foregoing conduct.
> Released Claims include all claims for unpaid wages, overtime wages,
> statutory penalties, civil penalties, damages of any kind, interest, attorneys'
> fees, costs, injunctive relief, restitution, and any other equitable relief under
> California or federal statute, ordinance, regulation, common law, or other
> source of law, including but not limited to the California Labor Code,
> California Business & Professions Code, California Civil Code, California
> Industrial Welfare Commission Wage Orders.

(*Id.* art. I, ¶ hh.)

The PAGA group members and the State of California also release the same

individuals and entities of "Released PAGA Claims."  (*See id.* § 5.02.)

> "Released PAGA Claims" means all claims, demands, rights, liabilities,
> penalties, fees, and causes of action under PAGA during December 23, 2018
> through the date of preliminary approval) including under Labor Code
> sections 558 and/or 2698 et seq., predicated on any Labor Code violations
> alleged in the operative complaint in the Action (which include, but are not
> limited to, Labor Code sections 200, 201, 202, 203, 218.5, 221, 223, 226,
> 226.3, 226.7, 227.3, 500, 510, 512, 516, 1174.5, 1182.11- 1182.12, 1194,

1194.2, 1197, 1198, 2802, 6400-6401) or that could have been alleged in the operative complaints in the Action based on the facts, policies, practices, occurrences, or acts alleged in the operative complaints in the Action, or that are based on any failure to pay minimum, regular, or hourly wages, and/or alleged off-the-clock work; failure to pay overtime wages or accurate overtime wages; failure to provide compliant meal periods; failure to provide compliant rest periods; failure to reimburse for necessary business expenses; failure to pay vacation wages; failure to pay timely wages during employment or upon separation; failure to provide accurate and/or complete wage statements.

(*Id.* art. I, ¶ ii.)

## III.    DISCUSSION

### A.    Final Approval of Class Settlement

#### 1.    Class Certification

Before granting final approval of a class action settlement agreement, the Court must first determine whether the proposed class can be certified.  *See Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997) (indicating that a district court must apply "undiluted, even heightened, attention [to class certification] in the settlement context" in order to protect absentees).  In the present case, the Court has already certified the settlement class, and it stands by that certification.  (*See* Order at 7–13.)

#### 2.    Class Settlement Agreement Requirements

Approval of class action settlements is governed by Federal Rule of Civil Procedure 23(e).  A district court may approve a class action settlement only when it is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  A court must consider whether "(A) the class representatives and class counsel have adequately represented the

class[,] (B) the proposal was negotiated at arm's length[,] (C) the relief provided for the class is adequate[,] and (D) the proposal treats class members equitably relative to each other." *Id.* 23(e)(2)(A)–(D).  In determining whether the class's relief is "adequate," courts must analyze "(i) the costs, risks, and delay of trial and appeal[,] (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims[,] (iii) the terms of any proposed award of attorney's fees, including timing of payment[,] and (iv) any agreement required to be identified under Rule 23(e)(3)." *Id.* 23(e)(2)(C).

Case law concerning the reasonableness of a class action settlement largely predates the 2018 amendments to Rule 23.  Prior to those amendments, the Ninth Circuit instructed district courts to consider the following factors in determining whether a settlement agreement was fair, reasonable, and accurate:

> (1) the strength of plaintiffs' case[,] (2) the risk, expense, complexity, and likely duration of further litigation[,] (3) the risk of maintaining class action status throughout the trial[,] (4) the amount offered in settlement[,] (5) the extent of discovery completed, and the stage of the proceedings[,] (6) the experience and views of counsel[,] (7) the presence of a governmental participant[,] and (8) the reaction of the class members to the proposed settlement.

*Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019) (citation omitted) (cleaned up); *see also Staton*, 327 F.3d at 959.

The Ninth Circuit has not expressly addressed how the analysis may have changed with the 2018 amendments.  *See Saucillo v. Peck*, 25 F.4th 1118, 1124 n.3 (9th Cir. 2022) ("The Federal Rules of Civil Procedure were amended in 2018 . . . . Because we vacate the district court's approval of the settlement agreement in this case for [other] reasons . . . , we need not reach the question as to how district courts should incorporate the Rule 23(e)(2) factors into their analyses.").  But it bears noting that the prior factors

correlate with the new language of the rule.  Moreover, the Ninth Circuit in recent cases has analyzed class settlements while invoking the pre-2018 factors.  *See Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 n.10 (9th Cir. 2020) (noting that "applying the amended version of the rule would not change our conclusions" and "'[t]he goal of this amendment is not to displace' any of the factors historically considered in assessing settlement fairness" (alteration in original) (quoting Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment)); *see also Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021).  Thus, the Court considers the pre-2018 factors to the extent that they shed light on the inquiry mandated by the amended Rule 23(e).

When, "as here, a settlement agreement is negotiated *prior* to formal class certification," the settlement "must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair."  *Jones v. GN Netcom, Inc.* (*In re Bluetooth Headset Prod. Liab. Litig.*), 654 F.3d 935, 946 (9th Cir. 2011).  Courts must be wary of "'subtle signs' of collusion," such as "(1) when counsel receive a disproportionate distribution of the settlement[,] (2) when the parties negotiate a 'clear sailing' arrangement (i.e., an arrangement where defendant will not object to a certain fee request by class counsel)[,] and (3) when the parties create a reverter that returns unclaimed funds to the defendant."  *SFBSC Mgmt.*, 944 F.3d at 1049 (cleaned up).  The Court "cannot, however, fully assess such factors until the final approval hearing."  *Dixon v. Cushman & Wakefield W., Inc*, No. 18-cv-05813, 2021 WL 3861465, at *10 (N.D. Cal. Aug. 30, 2021).

In its order preliminarily approving the settlement, the Court found that Rule 23(e) factors weighed in favor of approval.  (*See* Order at 16–23.)  No new facts have emerged to cast doubt on approval.

The Court had previously raised for the parties' attention the "clear sailing" arrangement in the settlement agreement.  While the arrangement is troubling, it is not a "death knell," *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 610 (9th Cir. 2021), and after "peer[ing] into the provision and scrutiniz[ing] closely the relationship between attorneys' fees and benefit to the class," *Kim*, 8 F.4th at 1180 (citation omitted), the Court will not hold up the settlement.  As the Court noted on preliminary approval, the settlement provides a good recovery for the class.  The inference of collusion from a clear sailing arrangement is diminished, moreover, when class counsel's fees are "to be made from the settlement fund," *Rodriguez v. W. Pub'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009), and "when the agreement lacks a reversionary or 'kicker provision,'" *In re Toys "R" Us-Del., Inc.—Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 458 (C.D. Cal. 2014) (citation omitted).  That is the case here.

The Court also questioned the basis for the parties' estimate that the settlement represented 13% of the total potential recovery, which they have now addressed.  Class counsel now explains that, upon review of the claims with an expert and extrapolating from Defendants' records and policies and counsel's interviews with class members, the estimated recovery on the claim for (1) failure to pay wages claim is $6,821, (2) failure to provide meal and rest periods is $974,503 (assuming a rest break violation rate of 100%), (3) failure to reimburse business expenses and provide safety devices is $52,406, (4) failure to pay vacation wages is $58,000, (5) failure to provide compliant wage statements is $232,600, (6) failure to pay wages at termination is $394,490, and (7) PAGA penalties is $1,563,800 (assuming full statutory penalties).  (*See* Settlement Mot. at 15–16.)  Thus, with interest, the total potential liability for Defendants is $3,282,620, which means that the settlement amount is, in fact, about 20% of the total potential recovery.  (*See id.* at 15–17.)

Accordingly, the Court reaffirms and incorporates by reference its analysis of the Rule 23(e)(2) requirements as set forth in the order of preliminary approval, (*see* Order at 14–22), and finds the Settlement to be "fair, reasonable, and adequate" pursuant to Federal Rule of Civil Procedure 23(e).

### 3.    Class Members' Responses to Notice

Phoenix Settlement Administrators is a professional settlement services provider that the Court previously appointed as the the settlement administrator.  (*See* Dkt. 30-2 [Declaration of Jarrod Salinas Regarding Settlement Notice Administration, hereinafter "Admin. Decl."]; Order at 24.)  Phoenix compiled names and addresses of class members from Defendants' records, processed them against the National Change of Address database maintained by the U.S. Postal Service, sent notice packets by first-class mail to members, performed a skip trance on the six notice packets that were returned, and received no notice packets returned as undeliverable.  (*See* Admin. Decl. ¶¶ 3–6.) Phoenix has received no requests for exclusion, objections to the settlement, or disputes regarding workweeks worked during the class period out of a class of 376 members.  (*See id.* ¶¶ 7–10.)

Because the settlement is "fair, reasonable, and adequate" pursuant to Federal Rule of Civil Procedure 23(e) and the settlement has received a favorable response from class members, the Court grants final approval of the settlement.

### B.    Final Approval of the PAGA Settlement

Under the PAGA, "an 'aggrieved employee' may bring a civil action personally and on behalf of other current or former employees to recover civil penalties for Labor Code violations."  *Arias v. Superior Ct. of San Joaquin Cnty.*, 209 P.3d 923, 930 (Cal.

2009).  An "aggrieved employee" is "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed."  Cal. Lab. Code § 2699(c).  In bringing a PAGA suit, an employee acts as "as the proxy or agent of the state's labor law enforcement agencies," *Arias*, 209 P.3d at 933, rather than as a representative of a group of people in the class-action sense, *see Baumann*, 747 F.3d at 1121.  Civil penalties recovered in a PAGA action are divided 75% and 25% between the LWDA and the aggrieved employees, respectively.  *See* Cal. Lab. Code § 2699(i).  And a judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." *Arias*, 209 P.3d at 933.

A court must "review and approve any settlement" in a PAGA action.  Cal. Lab. Code § 2699(*l*)(2).  The settlement must also "be submitted to the [LWDA] at the same time that it is submitted to the court," *id.*, which "allow[s] the LWDA to comment on the settlement if the LWDA so desires," *Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (citation omitted).  "[N]either the California legislature, nor the California Supreme Court, nor the California Courts of Appeal, nor the [LWDA] has provided any definitive answer to" the standard that courts are to use in reviewing a PAGA settlement.  *Flores v. Starwood Hotels & Resorts Worldwide, Inc.*, 253 F. Supp. 3d 1074, 1075 (C.D. Cal. 2017); *see also Haralson*, 383 F. Supp. 3d at 971.  "[A] number of district courts have," however, "applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes.'"  *Haralson*, 383 F. Supp. 3d at 971 (citation omitted); *see also O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1134 (N.D. Cal. 2016) ("[T]he Court must evaluate . . . the adequacy of the settlement in view of the purposes and policies of PAGA."); *Williams v. Superior Ct. of L.A. Cnty.*, 398 P.3d 69, 81 (Cal. 2017) ("PAGA settlements are subject to trial court review and approval, ensuring that any negotiated resolution is fair to those affected.").  A court may use a "sliding scale" to

evaluate the fairness of the PAGA settlement with the settlement of class claims for Labor Code violations. *O'Connor*, 201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972. "For example, if the settlement for the Rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled." *O'Connor*, 201 F. Supp. 3d at 1134.

The Court previously expressed approval of the PAGA portion of the settlement. (*See* Order at 26–27.) The Court has not received any filings from the LWDA, and no new facts have come to light to cast doubt on the appropriateness of the settlement. The Court thus reaffirms and incorporates by reference its analysis of the PAGA portion of the settlement as set forth in the order of preliminary approval. (*See* Order at 25–27.) Accordingly, the Court finds the settlement fair, adequate, and reasonable and approves of the settlement.

## C.    Costs and Expenses Awards

Class counsel request litigation costs and expenses in the amount of $24,892.46. (*See* Fees Mot. at II; Dkt. 27-3 [Declaration of Kiley Lynn Grombacher in Support of Plaintiff's Notice of Motion and Motion for Preliminary Approval of Class Action Settlement, hereinafter "Grombacher Decl."] ¶¶ 54–56; Dkt. 27-1 [Declaration of Raul Perez in Support of Motion for Attorneys' Fees, Costs, and a Class Representative Enhancement Award, hereinafter "Perez Decl."] ¶ 11.) The Court decides to award only $15,000. Attorneys are entitled to reimbursement of reasonable costs and expenses, which include "those out-of-pocket expenses that would normally be charged to a fee paying client." *See Harris v. Marhoefer*, 24 F.3d 16, 19–20 (9th Cir. 1994). Counsel has provided documentation to substantiate its costs, which include notice to the LWDA, arbitration, and filing fees. (*See* Dkt. 27-6 [Transaction Report].) But the settlement agreement provides that counsel may be awarded no more than $15,000 in actual costs, and counsel has not explained why the Court should (or even can) award costs more than

that amount—which is especially troubling, since any award to counsel comes out of the pockets of class members.  Indeed, awarding anything greater than the $15,000 specified in the notice to members, (*see* Agreement Ex. A [Notice of Class Action Settlement] at 4), would deprive them of a reasonable opportunity to "object to the motion," Fed. R. Civ. P. 23(h)(1).  Thus, class counsel are awarded $15,000 in costs and expenses.

Phoenix also requests costs and fees in the amount $9,000.  (*See* Admin. Decl. ¶ 16.)  This request is reasonable.  "Courts regularly award administrative costs associated with providing notice to the class" and issuing class settlement awards. *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015).  The settlement authorized costs for the settlement administrator up to $12,000, and Phoenix's work consists of tasks reasonably necessary for effectuating the settlement, such as calculating settlement award payments, issuing and mailing the settlement award checks, and tax filing and reporting.  (*See* Dkt. 30-4 [Phoenix Invoice].) The Court concludes that the amount and nature of these costs are reasonable and, therefore, awards $9,000.

### D.    Attorneys' Fees Award

Notwithstanding any agreement between the parties, "courts have an independent obligation to ensure that" an award of attorneys' fees, "like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941.  In other words, a court has the authority and the duty to determine the fairness of attorney fees in a class action settlement. *See Zucker v. Occidental Petrol. Corp.*, 192 F.3d 1323, 1329 (9th Cir. 1999).  The amount of fees awarded rests ultimately in the court's sound discretion. *See Evans v. Jeff D.*, 475 U.S. 717, 736 n.26 (1986).

"In a common fund case, such as this, the district court has the discretion to choose between either the lodestar or the percentage-of-fund methods when calculating fees."

*Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 738 (9th Cir. 2016). "Under the percentage-of-fund method, the district court may award plaintiffs' attorneys a percentage of the common fund, so long as that percentage represents a reasonable fee." *Id.* The Ninth Circuit has "established a 25 percent 'benchmark' in percentage-of-the-fund cases that can be 'adjusted upward or downward to account for any unusual circumstances involved in [the] case.'" *Fischel v. Equitable Life Assuance. Soc'y of the U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002) (citation omitted). "Under the lodestar method, the court multiplies a reasonable number of hours by a reasonable hourly rate. There is a 'strong presumption' that the lodestar figure represents a reasonable fee." *Id.* (citations omitted). With either method, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result," is to be avoided. *Stanger*, 812 F.3d at 739 (citation omitted).

The choice between the two methods is "well within the district court's discretion." *Id.* "Despite this discretion, use of the percentage method in common fund cases appears to be dominant." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008). And in applying either method, "the district court must 'provide a concise but clear explanation of its reasons for the fee award,'" including "the grounds on which it relied" and "how it weighed the various competing considerations." *Id.*

### 1.    Percentage-of-the-Fund Method

Counsel requests an award of attorneys' fees at 33.33% of the Gross Settlement Amount, or $264,000.00. (*See* Fees Mot. at 7.) The Court indicated in its order preliminary approving the settlement that it would award no more than 25% benchmark, (*see* Order at 21), and it sticks by that determination.

"Selection of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002). "The Ninth Circuit has approved a number of factors which may be relevant to the district court's determination" of the appropriate percentage, including "(1) the results achieved[,] (2) the risk of litigation[,] (3) the skill required and the quality of work[,] (4) the contingent nature of the fee and the financial burden carried by the plaintiffs[,] and (5) awards made in similar cases." *Omnivision*, 559 F. Supp. 2d at 1046 (citing *Vizcaino*, 290 F.3d at 1048–50).

Those factors weigh in favor of selecting the 25% benchmark here. Counsel have not persuaded the Court to depart upwards from the benchmark. The results achieved are respectable but not extraordinary—about $1,215.43 per class member on average. (*See* Settlement Mot. at 6; Admin. Decl. ¶ 12.) That said, a downward departure is not appropriate either. There were real risks to continuing litigation. (*See* Order at 17–18.) Those risks include potential findings that Defendants had policies consistent with their obligations, that Defendants correctly included shift differential pay for those working eligible shifts, such as night shifts, that Defendants paid meal period premiums at higher shift differential rates, and that 93% of all eligible meal periods were compliant, i.e., on time and for the correct duration. (*See id.*) There also were the risks that the class would not be certified or would be decertified because individual issues of employer or supervisor conduct, for example, predominate. (*See id.* at 18.) "The [s]ettlement eliminates these risks by ensuring [c]lass [m]embers a recovery that is 'certain and immediate, eliminating the risk that class members would be left without any recovery . . . at all." (*Id.* [alterations in original] [citation omitted].) Counsel have experience in numerous wage-and-hour class actions. (*See* Grombacher Decl. ¶ 38; Perez Decl. ¶ 16.) Counsel also works on contingency basis, as attorneys the class-action context typically do. (*See* Grombacher Decl. ¶¶ 44–46.) Accordingly, the 25% benchmark is appropriate.

The Court applies that percentage *after* deductions for counsel's and the administrator's costs, however, lest counsel not only be reimbursed for the costs but also receive an additional 25% of those costs as a fee.  *See In re Apple iPhone/iPad Warranty Litig.*, 40 F. Supp. 3d 1176, 1182 (N.D. Cal. 2014) (calculating a 25% fee from a net settlement fund after deducting administration costs); *Kmiec v. Powerwave Techs., Inc.*, No. SACV 12-00222, 2016 WL 5938709, at *5 (C.D. Cal. July 11, 2016) (calculating attorneys' fee from net settlement award after deducting costs and administrative expenses); *Kanawi v. Bechtel Corp.*, No. C 06–05566, 2011 WL 782244, at *3 (N.D. Cal. Mar. 1, 2011) (same).

Subtracting the $15,000 in litigation costs and expenses for class counsel and the $9,000 in settlement administration costs for Phoenix from the $800,000 Gross Settlement Amount yields $776,000.  Applying the 25% benchmark rate to that sum yields $194,000.  Accordingly, counsel are awarded $194,000 in attorneys' fees.

## 2.    Lodestar Method Cross-Check

"Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award." *Vizcaino*, 290 F.3d at 1050.  Here, cross-checking the amount yielded by the percentage-of-the-fund method with that yielded by the lodestar method confirms that selection of the 25% benchmark is reasonable.

The lodestar method for calculating attorneys' fees involves multiplying the "number of hours reasonably expended by a reasonable hourly rate." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998).  That figure, which is the lodestar, may then be "adjusted upward or downward to account for several factors including the quality of

the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Id.*

Below are the timekeepers' respective hours expended on this action:

| Name | Role | Hours |
|---|---|---|
| Raul Perez | Partner | 15.2 |
| Orlando Villalba | Senior Counsel | 10.5 |
| Helga Hakimi | Senior Counsel | 14.7 |
| Roxanna Tabatabaeepour | Senior Counsel | 11.8 |
| Alexander Lima | Associate | 29.8 |
| Marcus Bradley | Partner | 10.5 |
| Kiley Grombacher | Partner | 49.6 |
| Lirit King | Senior Counsel | 10.6 |
| Maria Valle | Paralegal | 19.9 |

(*See* Grombacher Decl. ¶ 49; Perez Decl. ¶ 7.)

The timekeepers expended 172.6 hours in total. The total hours expended seems reasonable, given that the parties engaged in some discovery and participated in mediation before reaching a settlement and given that the lodestar method is being used only to cross-check the amount awarded under the percentage-of-the-fund method.

Below are the timekeepers' respective years of legal experience following admission to the California Bar and hourly rates:

| Name | Role | Experience | Hourly Rate |
|---|---|---|---|
| Raul Perez | Partner | 29 years | $950 |
| Orlando Villalba | Senior Counsel | 19 years | $700 |

| Helga Hakimi | Senior Counsel | 15 year | $650 |
|---|---|---|---|
| Roxanna Tabatabaeepour | Senior Counsel | 15 years | $650 |
| Alexander Lima | Associate | 4 years | $475 |
| Marcus Bradley | Partner | 29 years | $950 |
| Kiley Grombacher | Partner | 17 years | $900 |
| Lirit King | Senior Counsel | 16 years | $700 |
| Maria Valle | Paralegal | - | $250 |

(*See* Grombacher Decl. ¶ 49; Perez Decl. ¶ 7.)

These rates are roughly "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1994). Counsel attest that the rates are consistent with those in the geographic area of the Central District. (*See* Grombacher Decl. ¶ 50; Perez Decl. ¶ 8–9.) Further, "it is proper for a district court to rely on its own familiarity with the legal market" in determining reasonable rates, *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011), and the Court feels comfortable deeming these rates reasonable solely for the purpose of cross-checking rates awarded under the percentage-of-the-fund method. Some of these rates are, admittedly, higher than those typically charged in labor and employment litigation. *See, e.g.*, *Pagh v. Wyndham Vacation Ownership, Inc.*, No. 19-cv-00812, 2021 WL 3017517, at *3 (C.D. Cal. Mar. 23, 2021) (noting that "for Los Angeles attorneys who practice labor and employment law," partners charge an "average hourly rate of between $456 and $716, and associates between $345 and $540" and that "paralegals in the labor and employment practice area earn an average hourly rate between $142 and $227"). Even so, the concern is mitigated given that the contingent nature of wage-and-hour class action litigation generally warrants a risk multiplier.

Multiplying class counsel's rates by the hours expended yields $120,180.  The $194,000 award calculated under the percentage-of-the-fund method is about 1.61 times higher.  Even were the Court to reduce counsel's hourly rates to be more in line with the prevailing rates in the legal community, the risk multiplier needed to get from the lodestar amount to the percentage-of-the-fund amount would be within the range of reasonable multipliers.  *See Vizcaino*, 290 F.3d at 1051 & n.6 (approving of evidence that "the range of multipliers applied in common fund cases" was "0.6–19.6, with most (20 of 24, or 83%) from 1.0–4.0 and a bare majority (13 of 24, or 54%) in the 1.5–3.0 range"); *id.* n.6 ("[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."  (alteration in original) (quoting *In re Prudential Ins. Co. Sales Pracs. Litig.*, 148 F.3d 283, 341 (3d Cir. 1998)).  Thus, in the Court's judgment, the lodestar cross-check confirms the reasonableness of the amount awarded under the percentage-of-the-fund method.

### E.    Incentive Award

"Incentive awards are fairly typical in class action cases" and are "discretionary." *W. Pub'g*, 563 F.3d at 958 (emphasis omitted).  They "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."  *Id.* at 958–59.  In determining whether an incentive award is appropriate, courts consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions," and "the amount of time and effort the plaintiff expended in pursuing the litigation."  *Staton*, 327 F.3d at 977 (citation omitted).  "[A]wards typically range from $2,000 to $10,000."  *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 267 (N.D. Cal. 2015) (collecting cases); *see also Toys R Us*, 295 F.R.D. at 470 (explaining that

California district courts typically approve incentive awards between $3,000 and $5,000). A $5,000 payment is "presumptively reasonable." *Bellinghausen*, 306 F.R.D. at 266.

The motion for final approval includes a request for a $7,500 incentive award for Rodriguez. (*See* Fees Mot. at 11.) An award of $5,000, however, is appropriate. The Court expressed doubts on awarding more than $5,000 in its order preliminarily approving the settlement. (*See* Order at 23.) Nothing in the briefing on final approval has persuaded it to deviate upwards. Rodriguez says that he "assumed the risk of a judgment against him and personal liability for an award of costs to [D]efendant[s] in the event of an adverse outcome" as well as "reputational risk," "feels that his prospects for advancement in his career have been impacted by filing this action," and "spent upwards of 45.5 hours actively participating in this action." (Fees Mot. at 12.) Rodriguez deserves credit for his service, but there is nothing stellar about his efforts. His efforts are par for the course for a class representative in a wage-and-hour action. Accordingly, the Court sticks to its prior instinct and awards Rodriguez $5,000 as an incentive award.

//
//
//
//
//
//
//
//
//
//
//
//
//

**IV.    CONCLUSION**

For the foregoing reasons, the Court **GRANTS IN SUBSTANTIAL PART** the motion for final approval of the settlement agreement and **ORDERS** as follows:

- The settlement agreement, (*see* Dkt. 23-1 Ex. A), and the terms and conditions of settlement set forth therein, are finally approved.
- The parties and Phoenix Settlement Administrators shall fulfill their remaining obligations under the terms of the settlement agreement.
- Settlement class counsel are awarded $15,000 in costs and expenses.
- Phoenix Settlement Administrators is awarded $9,000 in costs and expenses.
- Settlement class counsel are awarded $194,000 in attorneys' fees.
- Sandro Rodriguez is awarded $5,000 as an incentive award.

DATED:    June 12, 2023

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE